Our third case this morning is United States v. Fernandez. Good morning, your honors. My name is Gabriela Aleja. With the Federal Defender's Office, I represent the appellant, Luis Fernandez, in this case. When police stopped Adam Vokes in November of 2016, Mr. Vokes had two guns. One in his pocket and one in the center console of the car. Also in his pocket was ammunition for both guns. He was arrested and in his initial statement to police, he gave them a detailed account of how those guns got in his pocket and how the gun got in the center console. Luis Fernandez was charged because he recanted on his statement about the gun in the center console. He first told police that he didn't know that the gun was in there, and then he ultimately told police that it was Fernandez who put it there. That's all the government had here. They didn't have DNA, they didn't have fingerprints, and they didn't have any other witness corroborating or supporting Mr. Vokes' account of what happened, even though there was a third witness in the backseat of that car. In the days before trial, Mr. Vokes sent text messages to that passenger in the backseat, Valerie Stromalski. In those text messages, he demonstrated bias against Mr. Fernandez. Among other things, he noted one of them was going down and it wasn't going to be Vokes. So this was a whodunit case. Specifically, who possessed the gun in the center console of the car? At the beginning of trial, everybody agreed on one thing. Adam Vokes was a liar. The issue in the case was which one of the stories that he gave was true and why. To present a defense, Fernandez needed to show what Vokes said to police, each one of the statements, and to argue the motive and bias behind each one of those statements. He needed to show context with those statements. But during the cross-examination of this key witness, Mr. Vokes, the district court barred defense counsel from asking any questions about how the officer confronted him or even what the officer asked him. Trying to differentiate between the various statements was almost impossible without the context of the officer's questions and the confrontation by the officer. Were you able, albeit in a cumbersome way, to eventually establish what questions Mr. Vokes was asked and what answers he gave while being interrogated? Ultimately, I was able to get into evidence some of the questions that were asked. Certainly, his statements didn't come in because he indicated that he didn't remember any of them. He only remembered telling police that Mr. Fernandez put the gun in the car. The questions came into evidence, yes. Can you tell us what pieces of his evolving version of events you were not able to establish by virtue of the hearsay objections that Judge Pepper was sustaining all along? Absolutely. When Adam Vokes gave his first statement, he told police that he had gotten the gun from Dominic Medell. That came into evidence. What didn't come into evidence is that Dominic Medell was someone that he went to the methadone clinic with. As we know, methadone clinics treat people with heroin addictions. In addition to that, there was not evidence that came in about the circumstances under which he got that gun. Mr. Medell's wife had passed away and he was feeling suicidal, so he sold or gave the gun to Mr. Vokes so that he wouldn't do anything with it. Concerns about what crimes are tied to that gun didn't necessarily have anything to do with Fernandez, but perhaps because he got it from a person that was addicted to heroin and was concerned about his own safety in having that gun. I wasn't able to get that information in. The second statement that he gave was that he didn't even know that it was in the car. He specifically told police, I didn't even know that it was in there. I didn't see Fernandez with it. I didn't see him put it in there. I had no idea that it was in there. That was really easy for police to confront because in his first statement, he was the one to tell police that the gun was in the center console. When police confronted him and said, well, how did you know where the gun was? He started to say, well, you told me, and the officers immediately cut him off and said, no, we didn't. It was at that point that he said, well, I saw Fernandez with it. Then he went with that story. Neither of those statements came in because when I asked him questions about it, he said he didn't remember. Officer Frosty actually gave the defense an opportunity to rectify this error. But when counsel began to ask questions about the several inconsistent statements that Mr. Volk gave, again, the court barred counsel from asking about any of them. Now, regarding the cell phone text, your position is that once Mr. Volk asked Ms. Genachowski, the backseat passenger, about the context of the text, and you were precluded from doing so. Now, did you make an argument to Judge Pepper at that point that the circumstances regarding the text had changed? Such that Mr. Fernandez ought to be permitted to introduce extrinsic evidence of the text. I did not. I did not ask the court to reconsider her decision. So, simply put, the jury just didn't get evidence about what Mr. Volk said the night of his arrest. Instead, they got kind of a different version of what he actually told police. And that version was elicited through improperly leading questions from the government. At closing, the defense lacked any evidence to argue what statements were made and the motivation behind those statements. Something that the government capitalized on when it argued that defense's counsel's remarks and arguments were based on faulty memory. And not in what was presented at trial. The text messages that were excluded demonstrated bias. I don't, and evidence of bias isn't excluded under Rule 608. The text messages weren't being introduced to show that he was dishonest. They were there to show that he had a bias. That he wanted, that one of them was going to survive and it wasn't going to be Fernandez. The government also capitalized on this error in its closing when it argued to the jury that the jury didn't even know if these text messages existed. Again, Volk said that he didn't remember any of the text messages. On two different occasions actually flat out denied sending these messages. And so, defense really couldn't say that these text messages existed. The district court excluded evidence that was the sole issue at trial. Which one of these stories is true? And the jury didn't get the stories. The district court also excluded evidence of the text messages that demonstrated the bias. Also an issue in trial, right? Why would Volk's lie? Yet, it introduced evidence about Fernandez's warrant. It had no prohibitive value and it ultimately was used as propensity evidence by the government. To prop up its own witness and to make Mr. Fernandez look like a fugitive criminal. All of these errors prevented Fernandez from presenting his case. It implicated his ability to confront the witness against him. There was a sole witness that said he had a gun in his hand. And thus prevented him from getting a fair trial. The government wants to say that there was no problem here. Because defense counsel got to ask Volk's what he said and the officer what he said. But the confrontation clause is not focused on what came out at trial. It's focused on the individual witnesses and whether there was any violation. Now the question about whether the evidence came in anyway, that's more of a harmless error issue. Not a confrontation issue. Here, if we look at the individual witnesses, there is a clear violation of confrontation right. The court did in fact bar all questions with Mr. Volk's about what the officer asked him. And all questions about what Mr. Volk said with the officer. Counsel could not elicit that information from either witness. With regards to the harmless error analysis, I think that even if we're looking at abuse of discretion. Even if we're not looking at de novo review. Mr. Fernandez still prevails. Because this evidence was so central and critical to this case. That he needed to be able to explore it. He needed to be able to show the jury who ultimately had to decide what story to believe that Mr. Volk said. And they didn't get it. So either way, Mr. Fernandez prevails. The government made an argument about Mr. Fernandez waiving the issue and not being specific with the confrontation clause. The government is mistaken. It's relying on the wrong subsection of the rule. And it's imposing a burden on defense counsel that it does not have. Specifically, the government cites the Federal Rule of Evidence 103, subsection 1, subsection A. You did not move to admit the text messages, right? I did. You did? Yes, that's what the court ruled at the beginning. So I explained to the court that we'd received these text messages and that I wanted to introduce them. That's when the court made the ruling about. Well, did you seek to use them for purposes of cross or you wanted them actually admitted as evidence in the case? Yeah. Initially, when we first found out about the text message, there was an objection from the government about them coming in. I asked the court to let me ask about them. If Mr. Volk would have admitted that he sent them in, the evidence would have been in. I wouldn't have had to show the jury the actual text messages. That became an issue when Mr. Volk denied recollection of sending any of them, even though it just happened three and four days before. Do you want to save some time for rebuttal? I do. Thank you. Thank you. Mr. Gonzalez. May it please the court, my name is Mario Gonzalez. I'm an assistant United States attorney for the Eastern District of Wisconsin. And I am appellate counsel and I was trial counsel in this matter. First, I just want to address a few things. Counsel talked in her argument about alleged errors that the government made in its closing arguments. And I think made the reference that was bolstering a witness with some of the government's arguments. There has been raised no issue as to the government's comments during closing arguments, both in the trial, the post-trial motion for a new trial, nor in the appellate briefs. So this is the first I'm hearing about any of this as the court is hearing it. Taking a look at the issues that were presented at trial, Ms. Leija talks and argues to this court that the district court barred her from asking questions of the witnesses in regards to Mr. Volk's statements. In fact, the court ruled on three separate occasions. She did. Asking Mr. Volk's what questions he was asked while being interrogated did not pose a hearsay problem, did it? I mean, the evidence, the defense was not eliciting the questions for their truth. It seems to me that when a witness has been questioned previously, it is standard impeachment to ask what questions he was asked and how he responded to those questions. I don't know where the hearsay comes from. The hearsay comes from in the form of the question that was asked. Didn't the officer tell you? And then the questions proceeded in that manner. Nothing in the court's ruling prevented Ms. Leija or Mr. Murray from cross-examining the witness, Mr. Volk's, by, quite frankly, they had the benefit of the greatest search for truth engine ever created, cross-examination. They could have walked Mr. Volk's through every statement that he gave to law enforcement, regardless of whether he may have claimed or didn't remember portions of any of those statements. They could have begun every question with, Mr. Volk's, didn't you initially tell the police X, Y, and Z? And, Mr. Volk's, didn't that story change after you were confronted by the police? And, Mr. Volk's, didn't you tell the police X, Y, and Z afterwards? And, Mr. Volk's, didn't your story change throughout the process of these interrogations? Which it did, and the government covered much of that in its examination, direct examination of Mr. Volk's. The government never hid from the fact that Mr. Volk's gave multiple statements before the third statement, admitting that where the gun had come from was, had come from Mr. Fernandez. So, the government never hid from any of that. The jury understood the context of the evolution of Mr. Volk's statements. As defense correctly noted, I admitted in my opening statement that he lied, that he lied throughout this process. But, based upon the evidence that was presented in the case, his ultimate story had the ring of truth,  Is that the point where, would that possibly happen if they found out the gun had been used for something else, and he could be pinned to it, is that? Yeah, that was presented to the jury. The fact that he was confronted by the sergeant prior to being released, he had already posted bond, was free to leave, and Sergeant Morris confronted him saying, well, Mr. Volk's, we're going to run a background check on this gun, and then we're going to determine whether it was used in any other crimes. And it was at that point, Sergeant Morris indicated that he saw the change in attitude on Mr. Volk's face. He realized that he was willing to change his statements. They took him back into the interview room, and they asked him some more questions, and then he freely admitted what had happened. He realized what was going on. The evidence in this case was Mr. Volk's had purchased a handgun from a sports authority store or a sporting goods store just blocks from where he was ultimately stopped. He purchased that firearm legally. He had no basis for having to get a gun elsewhere. That gun was licensed to him. He purchased it legally. It was in his pocket. It was a small-caliber gun. It was clean, well-maintained. It was, as he argued or he told the jury, was for his own personal protection based upon his work as a heating and air conditioning guy who went into many different buildings in many parts of the city. The firearm that was found between the seats was a .45-caliber handgun in poor mechanical shape that had been stolen in a previous burglary. Mr. Volk's had no reason to own two firearms, completely different types of firearms. The officers testified as to the different shape and the mannerisms and the size of these firearms, that they seemed to be somewhat inconsistent. So by comparison, it would show that it really wasn't his or what? No, that he had a legitimate firearm. He had no need to get a firearm anywhere else. I mean, as far as the one that's in question? Well, the one… The one that was found in the council or whatever you call it. The .45-caliber handgun, as the officer described, it was more along the lines of a cannon. It was inconsistent with the firearm that Mr. Volk's actually purchased and had lawfully purchased and was licensed under the… Evidence that it wasn't his. I mean, that's what the indication would be. And his own word. And the jury was in a unique position to watch his demeanor throughout the entire direct and cross-examination. They got to see how he reacted to questions asked by the government and asked by the defense. They got to make that determination of credibility as they're entitled to do so. Now, I want to ask you, please, why weren't Mr. Volk's texts to Ms. Strzomkowski admissible to show his bias or motive? It seems to me that one can infer from those texts that he had either an ax to grind against Mr. Fernandez or, at the very least, a motive to make sure that it was Mr. Fernandez rather than he who went to prison. Well, I think, first, when we look at the text messages, the text messages became available to the government not before trial but during trial. The jury was selected. The government was about to give opening statements, and then the government was provided a list of text messages allegedly provided to the defense just before opening statements from a witness that has been designated… I think could be designated as a hostile witness. She was served by the government, asked to contact the government, never made any contact with the government. And, in fact, the trial on cross-examination admitted she was dating Mr. Fernandez at the time. So there was plenty of reasons to question the veracity of these text messages. But even before we got to examine all of that, the defense made it clear, and it's as listed in the… Why do you say veracity? Are you saying they didn't exist? I'm not saying that they didn't exist, but I don't know. It wouldn't be the first time that I've seen something on a photocopy of something that wasn't actually what it purported to be. They were photocopies of screenshots of a cell phone. I didn't have a chance to look at the… to compare any phone records to determine whether there were any communications created. I don't know where these came from. I didn't have a chance to go through Mr. Volk's, to go through any of these text messages. I was about to give my opening statement when they were provided to me. So it put me in a difficult position. And the court didn't make a determination as to the admissibility of those text messages. As put in the government's brief, the government… the court asked the defense, what are your intentions with these text messages? And the defense… Well, the cell phone was the same as the number from which the texts apparently came. I had no… prior to my giving… handing me those text messages, I didn't know what Mrs. Volk's… Mrs. Stromowski's cell phone number was in relation to Mr. Volk's. I don't know whether Mr. Volk's had exclusive control over the cell phone that he was… that he was contacted with. I don't know who else used that cell phone. It's not uncommon for people to share cell phones. I don't know… I didn't know anything about this. But ultimately, the court didn't make that determination. The defense, in its argument to the court, indicated that we are going to use these for cross-examination purposes. And the court didn't say, I'm restricting you from using these items. The court asked, what do you plan to do with these items, these text messages? And the response was clear from Mr. Murray and Ms. Leija that they were going to use them for cross-examination purposes. As far as the text messages were concerned, the defense was able to elicit a great deal of information regarding these text messages. As the court indicated in its post-trial motion, they read a number of them into the record. They were able to cross-examine Mr. Volks extensively on the text messages. And also, the text… I think it's important to note, these text messages allegedly took place a few days before the start of the trial. I guess over the weekend or so prior to the Monday morning trial. These text messages had nothing to do with whatever the relationship or the observations of any of these witnesses were on the year prior when this incident occurred, when the firearm was taken from the vehicle. Also, the… I think that it wasn't fully explored, but there was… in just… in speaking with the witness, which I conveyed to the court, they apparently had gone through a nasty breakup over that weekend, and there were mixed conversations as to who the text messages were referenced to, whether they were in reference to… some of them were in reference to Mr. Fernandez or to a new gentleman that Mr. or Ms. Stromowski was dating. So there was even some confusion as to where… who these text messages were referencing, because there was some profanity and some… Well, look, the defense had timely revealed the existence of the text to both, you know, the government and the court. And but for, it seems to me, the court's ruling that extrinsic proof of the texts was inadmissible, the government could have inspected her phone or taken other steps to verify the authenticity of the texts. So… I do have a problem with that. I don't know that the court ever made a specific ruling excluding the text. The court asked the defendants how they wanted to use these texts, and they made it clear on the record that they were going to use them for cross-examination purposes. And the court made it clear at that time, saying, well, okay, you can use them for cross-examination purposes. That was initially, that was initially, the defense initially agreed, as I recall, not to try to introduce the substance of the text into evidence, but understandably, seems to me, changed course, and did try to elicit from Stromowski what the text messages said after Mr. Vokes was professing this amnesia. I don't know if it was amnesia or it was confusion in that it was clear that Ms. Stromowski was dating the defendant, but also in a relationship with another gentleman. And Mr. Vokes was confused as to which text messages we were talking about, whether they were about the new, the boyfriend that was out of custody or the boyfriend that was in custody. So I don't, as far as feigning amnesia, I don't know that he was given an opportunity to see, they were given an opportunity to cross-examine him with the essence and contents of those text messages, and bring out the bias by their pointed questions that they asked, and the court addressed that in the post-trial motion, indicating that they read them in verbatim, multiple times, these text messages. So they were, the issue was before the jury. The only issue was whether the jury could actually see the text messages and physically hold them as opposed to the testimony of the witness as cross-examined by the defense. So the text messages did come into evidence. It's just a question of the form in which they came into evidence, but they were presented to the jury, and the jury could consider them. I see that I'm out of time. Thank you, and I ask that this court affirm Mr. Fernandez's conviction. Thank you, Mr. Gonzalez. Ms. Lea? Thank you. So one of the things that we didn't talk about is the bullets in the pocket. One of those bullets matched the .45 caliber gun that was in the center console of the car. At trial, Mr. Volk said that he didn't know how it got in his pocket, or how it got in the chair. He just found it on the chair, and he just stuffed it in his pocket. He actually told police in his first statement, and this didn't come out in trial, the car that he had been driving he had in his garage for about a week, and he'd been working mechanically on it. And while he was working on it, he placed the gun, the .45 caliber gun that he got from the person he met at the methadone clinic, in the center console of the car. And while he was cleaning up the garage, he picked up the bullet and stuck it in his pocket in the garage. In that first statement, he told police, I had even forgotten that I put that gun in there. He told police that Fernandez didn't know that it was in there, and that Ms. Chermowski didn't know that it was in there either. And again, at trial, I wasn't really able to get any of that evidence in, and I could only do so much with the fact that there was a .45 caliber bullet in his pocket that matched that big cannon gun. In addition to his, moving on to the statement, the government provides that he was free to leave. That's not true. The sergeant said that he didn't believe his story, he wanted more out of him, and they took him back into the interrogation room. And in fact, started that interrogation with, we're giving you a chance to help yourself out here. So it wasn't like he was free to leave. They did take him back in there. With regards to the jury understanding that there were several inconsistent statements, that doesn't really help Fernandez. Because they don't have those inconsistent statements. They don't know what they were. So they can't evaluate which one of them was true. They can't evaluate which one of them they want to believe. And with regards to the text messages, all of the arguments that the government has made to date goes to weight, not admissibility. Those are all of the arguments that the government could have made to the jury, saying don't give them that much weight, don't really pay attention to those. None of the arguments go to admissibility. Admitting for a moment that there's a hearsay problem, accepting your position on hearsay, is there anything in the contents of the text that you were unable to use during cross-examination? There was no, I was able to ask fully about those questions. But they did not come into evidence because they were my questions. And when folks indicated he didn't send them and he didn't remember them, they were not evidenced. That's actually a fact that the court itself admitted, not so much specifically on statements, but about the fact that it came out during my closing and in my questions, all of these different issues. In page 10 of the appellate, of my brief, or just the appendix, number 31, the court notes or admits that the evidence came in through the questions that the defense counsel asked. And it also came in, not in evidentiary form, but it was emphasized in argument at the end of the case. So the court admitted that the substance of it didn't come into evidence. And the last point that I just wanted to make was, I'm sorry, going back to the text messages, I just want to let the court know that the government was given an opportunity to view the statements, rebuff those requests to look at the text messages, and in addition, Mr. Folks was his star witness, could have looked at those for accuracy himself. Thank you. Thank you. Thanks to all counsel. Case is taken under advisement. The court will proceed to the fourth case, white versus.